IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ALLAN RAY DAY,
      Petitioner,

vs.                          Case No.:  3:18cv1506/MCR/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Allan Ray Day ("Day") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent ("the State") answered, providing relevant portions of the state court record (ECF No. 17).  Day replied (ECF No. 21).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the parties' pleadings and the state court record, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Day is not entitled to habeas relief.

I.    BACKGROUND AND RELEVANT PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed (*see* ECF No. 17 at 2–4; ECF No. 21).  Day was charged in the Circuit Court in and for Walton County, Florida, Case No. 2011-CF-150, with one count of trafficking in hydrocodone (14 grams or more but less than 28 grams) (Ex. B1 at 22).[1]  On December 6, 2011, a jury found Day guilty as charged (Ex. B1 at 162, Exs. B4, B5).  On January 19, 2012, the court sentenced Day to a mandatory minimum term of fifteen (15) years in prison, with pre-sentence jail credit of 70 days (Ex. B1 at 177–81, Ex. B6).

Day, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-705 (Ex. B7).  On July 26, 2013, the First DCA affirmed the judgment (Ex. B10).  *Day v. State*, 119 So. 3d 485 (Fla. 1st DCA 2013).  The mandate issued September 16, 2013 (Ex. B13).  Day sought discretionary review in the Supreme Court of Florida, Case No. SC13-1927 (*see* Exs. B14, B15).  The supreme court denied the petition for review on July 9, 2014 (Ex. B16).  *Day v. State*, 147 So. 3d 522 (Fla. 2014) (Table).

---

[1] Unless otherwise indicated, citations to the state court record refer to the exhibits submitted with the State's answer (ECF No. 17).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.:  3:18cv1506/MCR/EMT

On January 15, 2015, Day filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. C1 at 32–52). Day filed a "Supplemental Motion" on March 9, 2015 (*id.* at 53–112). On March 25, 2015, the state circuit court struck the motion and supplement, with leave to file a single, amended Rule 3.850 motion within sixty (60) days (*id.* at 113–16). Counsel appeared on Day's behalf and filed an Amended Rule 3.850 motion on May 28, 2015 (*id.* at 179, 234–47). On April 5, 2016, the circuit court held a limited evidentiary hearing on three of Day's four claims (*id.* at 276–78, 282–372). The circuit court denied Day's Amended Rule 3.850 motion on November 22, 2016 (*id.* at 373–89). Day appealed the decision to the First DCA, Case No. 1D16-5598 (Ex. C2). The First DCA affirmed per curiam without written opinion on December 22, 2017 (Ex. C5). *Day v. State*, 238 So. 3d 214 (Fla. 1st DCA 2017) (Table). The mandate issued January 19, 2018 (Ex. C6).

Day commenced this federal habeas action on July 5, 2018 (ECF No. 1).

II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme

Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of

our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).   If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1).

The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

## III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). For purposes

of exhausting state remedies, a claim must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. *Picard*, 404 U.S. at 277.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). In such an instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Id.* at 1303.

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice. *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of

justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* The actual-innocence exception is a narrow exception that requires factual innocence, not mere legal insufficiency. *McKay v. United States*, 657 F.3d 1190, 1197–98 (11th Cir. 2011).

IV.  DAY'S CLAIMS[2]

A.  <u>Ground Two:  "The trial court's summary denial of Ground B of Petitioner's 3.850 and the district court's per curiam affirmance on appeal resulted in a decision that was contrary to or based on an unreasonable application of clearly established federal law and/or was based on an unreasonable determination of the facts in light of the facts presented in the state court proceeding."</u>

---

[2] For organizational reasons, the court is addressing Day's claims in a different order than he presents them in his § 2254 petition.

Day alleges defense counsel was ineffective for failing to request a jury instruction on a prescription defense (ECF No. 1 at 19–21). Day states he presented this ineffective assistance of trial counsel ("IATC") claim in his Amended Rule 3.850 motion (*id.* at 21).

The State asserts it "appears" that Day exhausted his claim, but if this Court disagrees, the State "reserves the right to object" to his failure to do so (ECF No. 17 at 10–11). The State contends the state courts' adjudication of Day's IATC claim was not contrary to or an unreasonable application of clearly established federal law, nor was the adjudication based upon an unreasonable determination of the facts (*id.* at 24–30).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under *Strickland*, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms." *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "Even

if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And the petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the

particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

    2.    Federal Review of State Court Decision

Day presented this IATC claim as Ground I.B. of his Amended Rule 3.850 motion (Ex. C1 at 242–44).  In the state circuit court's written decision denying the claim, the court correctly stated the deficient performance and prejudice prongs of the *Strickland* standard as the applicable legal standard (*id.* at 374–75).  The circuit court adjudicated the claim as follows:

> In his second claim, the defendant alleges that his counsel was ineffective for failing ". . . to request a jury instruction that provides a legal defense to undisputed facts."  The defendant alleges counsel's failure to request the instruction "amounts to fundamental error."  The defendant alleges that counsel should have requested Florida's Standard Jury Instruction 3.6(n) because such instruction addresses the defendant's sole available defense at trial.  The defendant also alleges the omission of such instruction prevented the jury from being instructed the defendant could be acquitted of the underlying offense if his "prescription defense" was believed.
>
> The defendant does not demonstrate either prong of <u>Strickland</u>. In particular, "the Florida Supreme Court has made it clear that the failure to give a jury instruction on an affirmative defense does not constitute per se fundamental error."[FN 36]  Furthermore, the defendant references a standard jury instruction for use in criminal cases that was not adopted until 2013.[FN 37]  The defendant's trial occurred in December 2011, which is before the adoption of standard jury instruction in criminal cases 3.6(n).[FN 38]  Counsel could not be ineffective for failing to request a jury instruction that was adopted after the trial was complete and the defendant had been sentenced. Therefore, the instant claim is denied.
>
> [FN 36:  <u>Day v. State</u>, 119 So. 3d 485, 488 (Fla. 1st DCA 2013) (citation omitted).]

[FN 37:  In Re:  Standard Jury Instructions in Criminal Cases–Report No. 2011-05, 141 So. 3d 132 (Fla. 2013).]

[FN 38:  Fla. Std. Jury Instr. (Crim) 3.6(a) ("This instruction was adopted in 2013.").]

(Ex. C1 at 379) (citations to Amended Rule 3.850 motion omitted).  The First DCA affirmed the circuit court's decision without written opinion (Ex. C5).

Where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale.  *See Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018).  The federal court should then presume that the unexplained decision adopted the same reasoning.  *Id.*

According to *Wilson*, this federal court must presume that the First DCA adopted the state circuit court's reasoning, that Day failed to satisfy either prong of the *Strickland* standard.  This court must then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the U.S. Supreme Court.  *Richter*, 562 U.S. at 102. The federal court must deny a § 2254 petition if any fairminded jurist could agree with the state court's decision denying Day's claim.  *See Butts v. GDCP Warden*,

850 F.3d 1201, 1205 (11th Cir. 2017) (citing *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012)).

The "prescription defense" is codified in Florida Statutes and provides in pertinent part:

> (6)(a) It is unlawful for any person to be in actual or constructive possession of a controlled substance unless such controlled substance was lawfully obtained from a practitioner or pursuant to a valid prescription or order of a practitioner while acting in the course of his or her professional practice . . . .

Florida Statutes § 893.13(6) (2008). At the time of Day's trial, on December 6, 2011, Florida courts had recognized a prescription defense as available to those who had a valid prescription written directly on their behalf for the pills in their actual or constructive possession. *McCoy v. State*, 56 So. 3d 37, 39 (Fla. 1st DCA 2010) (citations omitted). However, as the state post-conviction court noted, the Florida Supreme Court did not adopt a standard jury instruction on the prescription defense until 2013, after Day's trial. That instruction reads:

> It is a defense to the charge of [possession] [trafficking via possession] for a person to possess a controlled substance which [he][she] lawfully obtained from a practitioner or pursuant to a valid prescription or order of a practitioner while acting in the course of his or her professional practice.

*In re Standard Jury Instructions in Criminal Cases–Report No. 2011-05*, 141 So. 3d 132 (Fla. Apr. 25, 2013) (Mem).

At Day's trial, the jury knew from the get-go that Day's defense was that he had valid prescriptions for the hydrocodone pills found in his possession on the afternoon of March 16, 2011.  During opening statements, Day's defense counsel, Attorney Joseph Reosti, told the jury:

> The main issue in the case, ultimately, is whether or not some or all of the hydrocodone pills in the bag that was found were from valid prescriptions that Mr. Day had, as the pharmacy records will suggest and Mr. Day will suggest, or whether or not they were purchased illegally, as the law enforcement officers will suggest.
> . . . .
> When I present my case, I expect, I fully expect that Shonda Huckaba will give testimony as to what she recalls what happened on . . . that day.  And although Mr. Day does not have to present himself for testimony, I fully expect that Mr. Day . . . will take the stand in this case and will explain . . . his story directly to you as the jurors in this case.
>
> As we mentioned in jury selection—and this point was made by Mr. Reed [the prosecutor] and was also made by me—you are certainly allowed to consider the training and experience of any law enforcement officers as they give . . . testimony.  That's common sense.  I mean these are trained police officers.  However, I ask that you don't weigh their testimony, give anymore additional weight to their testimony just because they're in uniform.
>
> And I expect that the evidence will show and that you'll have to resolve that—that the—officers had a strong interest in whether or not Mr. Day and Ms. Huckaba were arrested and charged on that day.
> . . . .
> You should hear testimony that Mr. Day was asked potentially to be a confidential informant in this case. . . . You'll the be instructed to consider this interest when weighing the officers' truthfulness.

I expect Mr. Day to testify that he told the officers that he had a number of valid prescriptions for the hydrocodone; that these pills were due to a number of . . . medical conditions that he has, including chronic kidney stone issues and injuries from a motor vehicle accident that he incurred in November of 2010. And he will deny that he had made any admissions to the officers.

And I . . . assume that Ms. Huckaba will also . . . deny that she made any admission.

You will then be provided, ultimately, with pharmacy records and medical records to . . . validate that the prescriptions were valid.

Obviously, . . . the officers are going to testify that they heard Mr. Day admit to illegally purchasing the hydrocodone pills.

You will have to follow, ultimately, the instructions and weigh the conflicting interests between Mr. Day and law enforcement officers as to the relative weight of their testimony. Remember the State's burden is to prove all of the elements of this crime beyond and to the exclusion of a reasonable doubt.

And based upon the conflicts between the interests that you're going to hear with the officers interest . . . in charges . . .being issued to Mr. Day that day and . . . that conflicting with the evidence that is going to be presented with respect to the to the prescriptions, I would hope that you would end up acquitting Mr. Day based upon reasonable doubt.

(Trial Transcript, p. 25–29).[3]

The jury was then presented with the following evidence. Officer Michael

Richter stopped Day's vehicle on March 16, 2011, because the windshield on the

---

[3] The court refers to the page numbers of the original trial transcript as they appear in the upper right corner of the page (*see* Exs. B4, B5).

Case No.:  3:18cv1506/MCR/EMT

driver's side was cracked significantly enough that it could obstruct the driver's view, in violation of Florida's traffic laws (Trial Transcript, pp. 30–31). Officer Richter made contact with Day, who was driving (*id.*, pp. 32–33). Two other officers, Officer Early and Detective Dees, arrived to assist with the traffic stop (*id.*, pp. 32–34).

Officer Early was a canine handler and worked with Vito, a canine certified and trained to detect marijuana, heroin, methamphetamine, and cocaine (Trial Transcript, pp. 40–42). Officer Early deployed Vito, and Vito alerted on both sides of Day's vehicle (*id.*, p. 43). Early told Day that Vito alerted on the vehicle for narcotics and instructed Day to exit the vehicle for a search of his person and the vehicle (*id.*). Officers searched Day and discovered only a knife on his person (*id.*). Officer Early discovered marijuana "shake" (broken-up pieces of marijuana) in the seat and floorboard on the driver's side of Day's vehicle (*id.*, pp. 43–44, 50).

Detective Dees spoke with Day's passenger, Shonda Huckaba (Trial Transcript, pp. 61–65). [4] Ms. Huckaba was shaking and "very nervous" (*id.*, p. 65). Detective Dees asked Huckaba if she had anything on her person, and she responded,

---

[4] Ms. Huckaba's first name is spelled "Shonda" in the trial transcript and "Shaunda" in the transcript of the post-conviction evidentiary hearing. The court will use the spelling in the trial transcript.

"You'll have to ask Ray [Day]" (*id.*).  Dees again asked Huckaba if he could search

her, and she said, "Ray, they're going to search me" (*id.*).  Ms. Huckaba then reached

down into the front of her pants and retrieved a baggie with blue pills in it (*id.*, p.

66).  Huckaba was outside the vehicle standing between the rear of Day's vehicle

and the patrol car when she retrieved the baggie (*id.*, p. 231).   Ms. Huckaba told

Detective Dees that Day gave her the pills as Officer Richter was stopping the

vehicle (*id.*, p. 233).  Huckaba told Dees that Day bought pills for himself and others

(*id.*).  Officer Early also saw Huckaba lean over and retrieve the baggie from her

person (*id.*, p. 44–45).  And Officer Early overheard Huckaba tell Detective Dees

she got the pills from Day while his vehicle was being stopped, and she "had it

crotched" (*id.*, pp. 45, 50).

Detective Dees separated Day and Huckaba and advised each of them of their

*Miranda* rights (Trial Transcript, pp. 67–68).  Both Day and Huckaba agreed to

speak with Dees (*id.*, p. 68).  Detective Dees asked Day where he got the pills (*id.*).

Day told Dees he purchased the pills from an individual "in the valley" and that he

knew it was illegal to have the pills in his possession (*id.*, pp. 68, 80, 231–32).  Day

told Dees he did not have a prescription for the blue pills in the baggie, but he took

them for pain (*id.*, pp. 68–69, 231–32).  Day told Detective Dees he once had a

prescription for hydrocodone, but he no longer had a prescription for that medication

(*id.*, pp. 69, 231–32).  If Day had mentioned he had a prescription for the pills in the baggie but did not have the prescription in his possession, Dees would not have arrested Day and instead would have asked another officer to escort Day to the pharmacy to verify the prescription (*id.*, pp. 70, 80, 83).  Dees arrested Day because Day stated he did not have a prescription for the blue pills (*id.*, pp. 83, 86).  Detective Dees and Officer Richter placed Day and Shonda Huckaba in custody, and Richter transported them to the jail (*id.,* p. 69).

Sergeant Powers interviewed Day at the police station after he advised Day of his *Miranda* rights and Day agreed to speak with him (Trial Transcript, pp. 90–92).  Day told Sergeant Powers he bought 33 hydrocodone pills from "a guy down in the valley" (*id.*, pp. 92–93, 235).  Day told Powers he handed the pills to Ms. Huckaba to hide them when Officer Richter stopped the vehicle (*id.*, p. 92, 235).  Day told Powers he had a prescription for Lortabs in the past, but he did not have a prescription for the 33 pills in the baggie (*id.*, pp. 92, 103, 235).  Sergeant Powers testified as follows with respect to the prescription issue:

> Q [by Attorney Reosti].  Did . . . Mr. Day, the defendant in this case, mention that he had prescriptions that were as needed; that were labeled as needed?
>
> A.  I don't recall anything.

Q.   You don't recall him mentioning that he had a valid prescription for this medication?

A.  He just told me that he had one in the past, a prescription for Lortabs in the past, but not for those that was [sic] recovered.

Q.  If he had a prescription that was as needed, even if three or four months old, would that be a valid prescription for this medication; for instance, if he had it in an orange bottle?

A.  If it was properly labeled.

Q.  If it was properly labeled and it was found in his house and there was three or four pills left over and it was in his possession and it was as needed but it was four months old, would that be a valid prescription?

A.  Yes, sir.

Q.  Would you make an arrest in that scenario?

A.  No, sir, I wouldn't.

(Trial Transcript, p. 103).

After Day was taken to the county jail, Sergeant Powers was notified that Day wished to speak with him (Trial Transcript, p. 97).  Day asked Powers if Powers could procure his pre-trial release if Day offered to act as a confidential informant for law enforcement (*id.*, p. 104).  Sergeant Powers told Day he "couldn't make any deals" (*id.*, pp. 104, 106).  Day's pre-trial bond was subsequently lowered so he

could perform as a confidential informant, but Day never actually did so (*id.*, pp. 234–35).

Sergeant Powers also interviewed Shonda Huckaba at the police station (Trial Transcript, pp. 235–36). Huckaba told Powers she "went down in the valley" to get the hydrocodone pills (*id.*). Huckaba told Powers that Day got the pills for himself and others (*id.*). Huckaba told Powers that Day gave her the pills when Officer Richter was stopping Day's vehicle, and Day was "very adamant" about her hiding the pills (*id.*).

Samuel Catalani, a crime laboratory analyst with the Florida Department of Law Enforcement, analyzed the pills that Shonda Huckaba retrieved from her pants and determined that the pills weighed 21.4 grams and contained a mixture of hydrocodone and acetaminophen (Trial Transcript, pp. 109–19, 121).

The prosecutor published a video recording of Day and Ms. Huckaba while they were in the backseat of Officer Richter's patrol car (Trial Transcript, pp. 125–29).[5] On the recording, Day asked Huckaba, "Why didn't you just hand them back

---

[5] In the First DCA's opinion on Day's direct appeal, the court noted that the court reporter's transcript of the video recording only denoted Day saying, "Before we got pulled over. Why didn't you just hold on to it? (Unintelligible) They don't never touch your crotch area." *See Day*, 119 So. 3d at 487 n.1. The First DCA independently reviewed the video recording, since it was admitted into evidence at trial and contained in the record on appeal. *Id.* The First DCA found that Day's statements in the video recording were "clearly intelligible" and Day "can unmistakably be heard saying the statements quoted in this opinion." *Id.* The undersigned includes the statements from the First DCA's opinion.

to me, Baby, instead of telling them about it?"  Huckaba indicated she did not know when she should have given the pills back to Day.  In response, Day said, "Before we got pulled over.  Why didn't you just tell me to carry them?  Because they don't never touch my nuts.  They don't never touch your crotch area.  They come up your leg and that's it."  After Ms. Huckaba told Day that the police were arresting her because they wanted to ask her more questions about where the pills came from, Day said, "I told them from my boy over across town."

In Day's defense, Attorney Reosti admitted into evidence Day's records from two pharmacies (Prescription Place and Walgreen's) as well as Day's medical records  (Trial Transcript, pp. 138–42, 144–45, 146–50, 152–57, 160, 161–66).  Day filled prescriptions in the names Allan Ray Day and Allan Ray Scott (*id.*, pp. 141, 144, 149).  The prescription records reflected Day had filled prescriptions for over 300 hydrocodone pills from August 2010 to November 2010.  *See Day*, 119 So. 3d at 487.[6]  The prescription records indicated the last prescription, filled on November 24, 2010, was for 28 pills (*see id.*, p. 145).  *See id.*  The medical records indicated

---

[6] The state court record filed by the State does not include the actual pharmacy and medical records, because they are "confidential" (*see* Ex. B1 at 38–121).  But the First DCA generally described the relevant contents of the records in its opinion in Day's direct appeal.  *See Day*, 119 So. 3d at 487.

Day visited the emergency room of Twin Cities Hospital on November 24, 2010, and December 26, 2010 (Trial Transcript, pp. 161–66). *See Day*, 119 So. 3d at 487. The records from the December ER visit, which occurred one month after Day's last prescription was filled, reflected that Day told the ER personnel he had been off of hydrocodone for over a week and needed a refill of pills. *See id.* Day also told the ER personnel he had gone to the ER for the purpose of obtaining a refill, and he had been taking hydrocodone daily for over 20 years. *Id.*

Shonda Huckaba testified she and Day had been living together for nearly ten years (Trial Transcript, p. 167). Huckaba testified Day suffered severe pain from kidney stones, surgeries, and a car accident on November 18, 2010 (*id.*, pp. 169–72, 175–76). She testified Day was prescribed pain medication for the intense pain (*id.*, p. 175). Huckaba testified Day usually took half a pill at a time "if he even takes one" (*id.*, p. 176). She testified that on some days, Day did not take any medication (*id.*). Huckabee testified the pills she was carrying on March 16, 2011, were Day's prescription pills (*id.*, pp. 175–76). Huckaba testified the pills were not in a bottle because their dog had "chewed up" the bottle (*id.*). Huckaba testified Day asked her to put the pills in her purse, but she stuck the pills down her pants because she was afraid the pills would spill and get crushed in her purse (*id.*, pp. 173–74). Huckaba denied she told officers that the hydrocodone pills were purchased illegally at

someone's house "in the valley"; she denied she told officers that Day purchased pills for himself and others; and she denied she told officers that Day gave her the pills to hide (*id.*, pp. 173–75).

Day testified that his "full name" was Allan Ray Day Scott (Trial Transcript, pp. 192–93). Day testified he had approximately 12–15 episodes of kidney stones over the previous four years (*id.*, p. 193). He testified he had four surgeries in September and October of 2010 (*id.*, pp. 194–95). Day testified he was also involved in a car accident on November 18, 2010 (*id.*, p. 196). Day testified he had prescriptions for hydrocodone from his treating physicians and physicians in the ER (*id.*, pp. 195–99). He testified he was prescribed more than 300 hydrocodone pills from August through November of 2010 (*id.*, p. 199). Day testified doctors usually prescribed 10 milligram pills, which were blue and oblong in appearance (*id.*, pp. 200–01). Day testified he took the pills on an "as needed" basis, because he understood they could be addictive (*id.*, pp. 200–04). Day testified he took only half a pill at a time (*id.*, p. 203). Day testified he still had leftover pills from his numerous prescriptions (*id.*, pp. 199–200).

Day testified the 33 blue pills in the baggie on March 16, 2011 were from a prescription he had picked up at the pharmacy (Trial Transcript, pp. 200–01, 204). Day testified the pills were in a baggie instead of a prescription bottle because their

dog had chewed up the bottom of the bottle (*id.*, pp. 204–05). Day testified he told Shonda to keep the pills in her purse for safety, and because he did not want the police to think he was doing anything illegal (*id.*, p. 208). Day testified he saw Shonda hand the pills to Detective Dees out the window before she exited the vehicle (*id.*, p. 220). He testified he heard Shonda explain, "We have Ray's medicine here, sir. That's all we have illegally, if you want to call that illegal" (*id.*).

Day testified he never illegally purchased hydrocodone, and he denied he went to "the valley" to procure hydrocodone pills on March 16, 2011 (Trial Transcript, pp. 201, 203, 215–16). Day testified he told Detective Dees the pills were his prescription pills that he obtained "from the old boy out there on 90 at the new pharmacy" (*id.*, pp. 209, 221–23). Day denied he told the officers he did not have a prescription for the pills and had purchased them illegally (*id.*, pp. 209–10, 221–23, 225).

Regarding the video recording, Day testified:

> I asked her [Shonda] why didn't she give them back to me where I could explain the basic facts of my medications and—instead of me having to deal with her being in trouble. They were my medications, as we explained to the officer; Sir, that's my medication; that's not hers. As she put it to them: You'll have to talk to Ray because this is his medications.
>
> Q [by Attorney Reosti]. But . . . your statements in the back of the police car weren't meant to indicate that you had—

A.  No, sir.

Q.  —bought them from a person in the valley?

A.  No, sir; no, sir; no, sir.  My comments, I told the officer I got them from the old boy out there at the pharmacy because I could not remember the name of it or Shane's name at that time.

Q.  What about hiding the medication?  Did you ask Shonda to hide the medication?

A.  No, sir.  No need to hide it, sir.  I had a prescription for them. I wasn't trying—If I—If it hadn't been for Millie chewing up my bottle, I'd have had them in the dang bottle to hand them to the officer.
. . . .
Q  Did you tell Officer Powers in any subsequent interviews, or Officer Dees for that matter, that you had purchased these prescription pills illegally?

A.  No, sir, I have not.

(Trial Transcript, pp. 210–11).

During closing arguments, the prosecutor argued that although Day told the officers he had a prescription for hydrocodone in the past, Day admitted to the officers that he did not have a prescription for the pills recovered from Ms. Huckaba (Trial Transcript, pp. 248–56).

Attorney Reosti argued the officers targeted Day and Ms. Huckaba because they wanted to develop and use them as possible confidential informants (Trial Transcript, pp. 257–64, 274–76).  Reosti argued that the only evidence of the alleged

confessions of Day and Ms. Huckaba was the officers' testimony, but that testimony was unsubstantiated because the officers "mysteriously" failed to record any of the interview (*id.*). Reosti argued that Day and Ms. Huckaba vehemently denied making the statements attributed to them, and it made no sense for Day to admit he purchased the pills illegally when he had valid prescriptions for them as evidenced by the pharmacy and medical records (*id.*).

The prosecutor again addressed the prescription issue in rebuttal:

> Now, ladies and gentlemen, the State is not contesting the fact that the defendant had a prescription for Lortab, or hydrocodone, at one point in time. However, the State has proven today, beyond a reasonable doubt, that the pills that were in his possession on March 16th of 2011 . . . were not prescribed to him and they were illegal to possess under Florida law.

(Trial Transcript, pp. 266–67).

At multiple points during the prosecutor's closing and rebuttal, he argued the jury should reject Day's claim that the pills at issue were from his prior prescriptions. The prosecutor did <u>not</u> argue that the jury could not consider Day's evidence of prescriptions—he simply directed the jury's attention to evidence to suggesting that the 33 pills at issue were not from a valid prescription. The prosecutor focused on Day's statements on the video recording and argued that someone who had a "valid

prescription" would not concoct a scheme to conceal prescription pills from law enforcement by putting them down someone's pants (*id.*, pp. 277–78, 280–81).

Despite the jurors' not hearing the prescription jury instruction, the jurors knew that if they believed that Day had a valid prescription for the 33 hydrocodone pills in the baggie, they had the option of accepting Day's prescription defense as an affirmative defense to the drug charge. The problem for Day was that even if the jury accepted Attorney Reosti's invitation to disbelieve the officers' testimony regarding Day's and Huckaba's alleged admissions, the jury was still left with the undisputed fact that Day and Huckaba attempted to hide the hydrocodone pills when police stopped the vehicle, and the fact that Day told ER personnel on December 26, 2010, over two months prior to the traffic stop, that he had run out of hydrocodone pills and needed a refill.[7]

As discussed *supra*, this federal court must deny habeas relief if any fairminded jurist could agree with the state court's decision. *See Butts*, 850 F.3d at 1205. A fairminded jurist could agree with the state court's determination that Day failed to show a reasonable probability the jury would have returned a different

---

[7] Indeed, the First DCA characterized the evidence supporting Day's prescription defense as "weak at best." *See Day*, 119 So. 3d at 490–91.

verdict if Attorney Reosti had requested a special jury instruction on the prescription defense. Day has not demonstrated he is entitled to habeas relief on Ground Two.

    B.    <u>Ground Three: "The trial court's summary denial of Ground D of Petitioner's Rule 3.850 and the district court's per curiam affirmance on appeal resulted in a decision that was based on an unreasonable determination of the facts in light of the facts presented in the state court proceeding."</u>

Day contends Attorney Reosti was ineffective for failing to investigate and obtain prescription information from Walmart and Ross Pharmacy (ECF No. 1 at 22). Day alleges he told Reosti to obtain prescription records from all five of the pharmacies he used during the five months prior to his arrest (i.e., October of 2010 to March of 2011), including Walmart and Ross' Pharmacy (*id.* at 22–23). Day alleges the records would have demonstrated beyond a reasonable doubt that he was in legal possession of the 33 hydrocodone pills (*id.*). Day states he presented this IATC claim in his Amended Rule 3.850 motion (*id.* at 23).

The State asserts it "appears" that Day exhausted his claim, but if this Court disagrees, the State "reserves the right to object" to Day's failure to do so (ECF No. 17 at 11). The State contends the state courts' adjudication of Day's IATC claim was not contrary to or an unreasonable application of clearly established federal law, nor was the adjudication based upon an unreasonable determination of the facts (*id.* at 31–36).

1.      Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Day presented this claim as Ground I.D. in his Amended Rule 3.850 motion

(Ex. C1 at 246–47).  The state circuit court adjudicated the claim as follows:

> In his fourth claim, the defendant alleges his counsel was ineffective for failing "to take steps to obtain crucial exculpatory documentation which had been requested by Mr. Day."  In particular, the defendant alleges his "counsel failed to request records from Wal-Mart's and Ross' pharmacies that would have confirmed Mr. Day's trip to the emergency room on 12/26/10, and established the validity of his prescription for Hydrocodone at the time of his arrest."  The defendant also alleges his counsel "took no steps to obtain Mr. Day's January 2011 prescriptions for Hydrocodone, again despite Mr. Day's repeated requests."
>
> At the evidentiary hearing, Mr. Joseph Reosti and the defendant testified.  Mr. Joseph Reosti testified he discussed the defendant's "medical condition and his prescriptions and the . . . different medical treatment he had."  Mr. Joseph Reosti testified "Mr. Day gave me all of the . . . areas in which he got the prescriptions.  Every one of the ones that he gave me, I went and got those records."  Mr. Joseph Reosti testified he "gathered a time line, . . . of all the medical treatment and the reasons why he was prescribed pills.  And I gathered those records up . . . paying particular attention to the age of the prescription."  Mr. Joseph Reosti also testified that he obtained "all of the medical records . . . that corresponded to [the defendant's] timeline of his medical treatment and all the locations where he said he procured pharmacies . . . And I introduced everything that I had." . . . Mr. Joseph Reosti testified the defendant never advised him he had failed to discover any additional prescriptions.  Furthermore, Mr. Joseph Reosti testified the

defendant made statements to law enforcement that "sounded like he illegally procured . . . the narcotics."

The defendant testified he asked Mr. Joseph Reosti "to collect any and all evidence of records from all five pharmacies of all my prescriptions due to the five kidney surgeries." The defendant also testified that he requested Mr. Joseph Reosti "to get records from Dr. Thomas at Crestview of the laser surgeries that I done . . . ." The defendant testified he requested Mr. Joseph Reosti to collect prescription records from Wal-Mart, Ross' Pharmacy, Prescription Place Pharmacy, and "all five pharmacies that I used in the last three to four months prior to my arrest." The defendant alleges the additional pharmacy records ". . . would have shown the December 26th ER visit with Dr. Steven at the Niceville hospital . . . from the car accident of November 18th; [and] of verification of a prescription that was filled in the first week to the second week of January of 2011. The defendant alleges that such information would "verify without a reasonable doubt that I had a more recenter [sic] . . . prescription" than was presented at trial. The defendant also testified he filled a prescription from "November 18th" at Prescription Place and a prescription from "December 26th" at Wal-Mart pharmacy. The defendant testified the only statements he made to law enforcement regarding the pills were he obtained them from "the Prescription Place pharmacy and Wal-Mart pharmacy."

After considering the testimony at the evidentiary hearing, the court concludes the defendant does not demonstrate an entitlement to relief. The court finds the testimony of Mr. Joseph Reosti to be credible. The defendant does not establish either prong of <u>Strickland</u>. The testimony at the evidentiary hearing reflects counsel investigated the defendant's prescription history and obtained prescriptions from all of the relevant pharmacies before the time of the underlying offense. Counsel could not be ineffective for failing to investigate pharmacy records of which the defendant did not advise him existed. Indeed, the testimony is clear the defendant could not provide counsel with exact dates or names of all pharmacies and counsel obtained all of the records that he could based on the limited information provided by the

defendant. Considering such information, counsel could not be deficient for failing to investigate or present records or information of which he was never informed existed.

To the extent the defendant alleges his counsel should have raised his emergency room visits and Prescription Place pharmacy records at trial, the testimony at the evidentiary hearing reflects such information was presented at trial. In particular, the defendant's testimony is clear that he told the jury of his November and December prescriptions. Mr. Joseph Reosti also obtained and introduced at trial the defendant's prescription records from the Prescription Place pharmacy and his medical records from Twin Cities hospital regarding his November and December emergency room visits. The defendant also appears to acknowledge that such records were introduced at trial. As a result, counsel could not be deficient for failing to investigate information that was presented at trial. Therefore, the instant claim is denied.

(Ex. C1 at 385–88) (citations to Amended Rule 3.850 motion and transcripts of trial and post-conviction evidentiary hearing omitted). The First DCA affirmed the circuit court's decision without written opinion (Ex. C5).

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011); *see also Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing *Rice v. Collins*, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the

record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")).  Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S. Ct. 843,74 L. Ed. 2d 646 (1983); *see also Smith v. Kemp*, 715 F.2d 1459, 1465 (11th  Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").

Questions of the credibility and demeanor of a witness are questions of fact.  *See Consalvo*, 664 F.3d at 845 (citation omitted).  "The deference compelled by the AEDPA requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations."  *Nejad v. Attorney*, 830 F.3d 1280, 1292 (11th Cir. 2016) (internal quotation marks and citation omitted).  Instead, "[i]n the absence of clear and convincing evidence, [courts] have no power on federal habeas review to revisit the state court's credibility determinations."  *Id.* (emphasis in original) (citation omitted).

Day has not presented clear and convincing evidence demonstrating that the state court's credibility determination was unreasonable.  Therefore, this court accepts Attorney Reosti's testimony at the evidentiary hearing as credible.  Attorney

Reosti testified Day did not provide him with any actual dates of prescriptions, Day just provided a time line of his ailments and medical visits (Ex. C1 at 636–38). Attorney Reosti testified he obtained all of the prescription records, and the medical records upon which those prescriptions were based, which Day told him about (*id.*). Reosti testified he presented all of those records at trial (*id.* at 636–38, 624). Reosti testified Day never told him he had any additional prescriptions (*id.*).

As the state court noted, Day testified that his records from Walmart pharmacy would have shown that during the ER visit on December 26, 2010, the doctor wrote a prescription, which the pharmacy filled during the first or second week of January of 2011 (Ex. C1 at 687–88, 691–92). But the trial transcript demonstrates that those medical records were admitted at trial (*see* Ex. B1 at 122–42). Day did not produce any additional pharmacy records at the post-conviction evidentiary hearing.

Considering the evidence presented to the state post-conviction court, the court reasonably concluded Day failed to establish deficient performance with respect to Attorney Reosti's alleged failure to investigate and present more prescription records. *See Van Poyck v. Florida Dep't of Corr.*, 290 F.3d 1318, 1325 (11th Cir. 2002) ("Information supplied by a [client] is extremely important in determining whether a lawyer's performance is constitutionally adequate."); *Williams v. Head*, 185 F.3d 123 1237 (11th Cir. 1999) ("An attorney does not render

ineffective assistance by failing to discover and develop evidence . . . that his client does not mention to him."). Day is not entitled to federal habeas relief on Ground Three.

>    C.    Ground Four:  "The trial court's summary denial of Ground C of Petitioner's Rule 3.850 and the district court's per curiam affirmance on appeal resulted in a decision that was based on an unreasonable determination of the facts in light of the facts presented in the state court proceeding."

Day contends Attorney Reosti was ineffective for failing to move to suppress the results of the search of his vehicle, on the ground that the crack in his windshield did not obstruct his view and thus did not violate Florida's traffic laws (ECF No. 1 at 24). Day states he presented this IATC claim in his Amended Rule 3.850 motion (*id.* at 25–26).

The State asserts it "appears" that Day exhausted his claim, but if this Court disagrees, the State "reserves the right to object" to Day's failure to do so (ECF No. 17 at 12). The State contends the state courts' adjudication of Day's IATC claim was not contrary to or an unreasonable application of clearly established federal law, nor was the adjudication based upon an unreasonable determination of the facts (*id.* at 37–40).

>    1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Day presented this IATC claim as Ground I.C. in his Amended Rule 3.850

motion (Ex. C1 at 244–46).  The state circuit court adjudicated the claim as follows:

> In his third claim, the defendant alleges his counsel was
> ineffective for "failing to move to suppress the results of Mr. Day's
> illegal stop and continued illegal detention."   In particular, the
> defendant appears to allege his counsel should have filed a motion to
> suppress challenging the traffic stop because the crack in the vehicle's
> windshield did not pose a safety hazard.   On the other hand, the
> defendant alleges law enforcement stopped the defendant's vehicle
> because a crack in the windshield on the driver's side was significant
> enough to obscure his view.   The defendant alleges "the crack was a
> two to three inch spider web crack in the top left corner of Mr. Day's
> windshield."   The defendant alleged "in no way did the crack pose a
> danger to Mr. Day, nor did it in any way obstruct his view."   The
> defendant also alleges he was not issued a citation for the cracked
> windshield; instead, law enforcement discovered "a baggie containing
> thirty-three Hydrocodone pills," after which the defendant made two
> incriminating statements regarding the pills."   The defendant alleges a
> motion to suppress would have been granted and the charges against
> the defendant would have been dismissed.
>
> At the evidentiary hearing, Mr. Joseph Reosti, Ms. Shaunda
> Huckaba, Mr. Cody Slay, the defendant, Mr. Michael Richter, and Mr.
> Marshall Dees testified.   Mr. Joseph Reosti testified he considered
> filing a motion to suppress.   In particular, Mr. Joseph Reosti testified
> he "pulled case law, . . . reviewed . . . the video that was presented to
> me, all of the discovery information that was presented to me, . . . took
> depositions, . . . and listened to the testimony of the officers."   Mr.
> Joseph Reosti also testified he "weighed all of that and made a decision
> that I didn't believe . . . at that time . . . that filing a motion to suppress
> would further the best disposition for Mr. Day's case."   Mr. Joseph
> Reosti testified a benefit to not filing a motion to suppress was "the
> offer on the table was a significant departure from . . . what the statute

called for with regard to the resolution of the case."  Mr. Joseph Reosti testified "whether or not the State kept that offer on the table was a significant issue . . . that I considered with regard to whether or not I should file a motion that I believed I had very little chance of winning." Mr. Joseph Reosti testified that even though the defendant declined to accept the plea offer at every opportunity, "whether or not . . . I file the motion to suppress and whether that has a significant impact on the plea . . . is very germane."  Mr. Joseph Reosti testified he weighed a "motion to suppress . . . that . . . was a long shot at best" with "keeping the five-year offer on the table to allow Mr. Day to consider it."

Additionally, Mr. Joseph Reosti testified he observed a video in which "the crack in the windshield was clearly visible."  Mr. Joseph Reosti testified "above the steering wheel you could see a crack that . . . was made even more pronounced by the sunlight reflecting off of the crack."  Mr. Joseph Reosti testified "the crack went across . . . from the driver's side . . . onto the passenger's side."  Mr. Joseph Reosti testified the "crack . . . was definitely obscuring the driver's visibility, just like the trooper had mentioned."  Mr. Joseph Reosti testified his observation of the crack in the windshield "lowered the percentage of success that I . . . considered with the motion to suppress down to well below 50 percent."  After viewing the in car video of the traffic stop, Mr. Joseph Reosti testified he did not believe he had a valid basis to file a motion to suppress.

Mr. Joseph Reosti testified the defendant understood why he did not file a motion to suppress.  Ms. Shaunda Huckaba testified she was riding in the defendant's vehicle when it was stopped by law enforcement for the cracked windshield.  Ms. Shaunda Huckaba also testified the crack had started on the passenger side."  Ms. Shaunda Huckaba testified the crack "was like running down towards the wiper blades."  Additionally, Ms. Shaunda Huckaba testified the crack "was not obscuring the vision of the driver."  Ms. Shaunda Huckaba testified the crack was approximately a foot in length and was "a hairline crack . . . not real thick."

Mr. Cody Slay testified he owned the vehicle the defendant was driving on the date of the underlying offense. Mr. Cody Slay also testified the vehicle's windshield "had one actual line across the top and one that come [sic] down around the windshield wiper blade." Mr. Cody Slay testified the crack was "the thickness of a pencil lead maybe." Additionally, Mr. Cody Slay testified the crack "was noticeable." M. Cody Slay also testified "there was nothing actually on the driver's side of the truck." Mr. Cody Slay testified the crack did not obscure the driver's view. Mr. Cody Slay testified he had been stopped by law enforcement before because of the crack in the windshield.

Mr. Michael Richter testified the defendant ". . . approached me from behind in a '80's model Toyota pickup" and he "observed that the windshield was cracked on the driver's side within view of the driver." Mr. Michael Richter also testified the defendant passed him and he "was still able to see that the windshield was cracked through the rear window of the vehicle." Mr. Michael Richter testified he "felt that it was unsafe to drive the truck." Mr. Michael Richter testified the crack "could have potentially caused a hazard for whoever was driving." Additionally, Mr. Michael Richter testified "that at that time, it was probably one of the more significant cracked windshields that I had seen." Mr. Michael Richler testified from the driver's position in the vehicle "your view would be obscured by the crack in the windshield."

The defendant testified he did not discuss with Mr. Joseph Reosti any suppression issues or "'what the procedure of that would have been." The defendant also testified the vehicle's windshield had "a couple of cracks." The defendant testified "there was a small spider web crack spot that had a little ten or twelve, 14-inch maybe hairline crack down toward the wipers. And then the one on the passenger side . . . that went across below where the wipers were." The defendant testified be believed the crack did not impair his visibility while driving.

Mr. Marshall Dees testified he inspected the defendant's vehicle while completing a vehicle inventory." Mr. Marshall Dees also testified the vehicle's windshield had "pretty severe" damage to the driver's

side.   Mr. Marshall Dees testified the defendant "stated that he previously had a prescription for hydrocodone; just not for the ones in his possession."

After considering the testimony presented at the evidentiary hearing. the court concludes the defendant has failed to demonstrate an entitlement to relief.   The court finds the testimony of Mr. Joseph Reosti, Mr. Michael Richter, and Mr. Marshall Dees to be credible.   The defendant does not establish either prong of <u>Strickland</u>.  The testimony at the evidentiary hearing reflects counsel did not have a valid basis upon which to file a motion to suppress challenging the traffic stop. The officers testified the vehicle's windshield had a visible crack that covered the driver's side of the vehicle's windshield.  Mr. Joseph Reosti testified he observed a video taken from the same angle as the defendant's view and the crack was "clearly visible."   The testimony indicates the crack would have obstructed the driver's visibility through the windshield.   Considering such information, counsel could not be ineffective for failing to file a motion to suppress that would have been frivolous.   In any event, the testimony is clear Mr. Joseph Reosti's decision not to file a motion to suppress regarding the traffic stop was a strategic decision by counsel.   Therefore, the instant claim is denied.

(Ex. C1 at 380–85) (citations to Amended Rule 3.850 motion and transcript of evidentiary hearing omitted).  The First DCA affirmed the circuit court's decision without written opinion (Ex. C5).

Day argues Attorney Reosti should have filed a motion to suppress, because Officer Richter did not have reasonable suspicion to stop the vehicle.

In *Terry v. Ohio*, the Supreme Court held that an investigatory stop requires a "well-founded suspicion that the person has committed, is committing, or is about to commit a crime."  392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  "While

'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (citations omitted). In considering whether an officer had a reasonable suspicion, the court looks to the totality of the circumstances to determine whether "the detaining officer [had] 'a particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (internal quotation marks and citation omitted); *Hilton v. State*, 961 So. 2d 284, 294 (Fla. 2007).

The reasonableness of a traffic stop depends solely on the validity of the basis asserted by the officer involved in the stop; and the officer's subjective intentions are not involved in the determination of reasonableness. *See Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). Further, a traffic stop based upon an officer's incorrect but reasonable assessment of the facts does not violate the Fourth Amendment—"so long as the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic

offense, the officer has probable cause to stop the driver." *United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003) (internal quotation marks and citation omitted).

In Florida, "a stop for a cracked windshield is permissible only where an officer reasonably believes that the crack renders the vehicle 'in such unsafe condition as to endanger any person or property.'" *Hilton*, 961 So. 2d at 292 (quoting Fla. Stat. § 316.610 (2001)).  "[I]f the crack as it existed and as it was observed by the officers would have created an objectively reasonable suspicion that [the] vehicle was unsafe in violation of section 316.610, then the stop would be valid." *Hilton*, 961 So. 2d at 295–96 (citing *Whren*, 517 U.S. at 813 (constitutional reasonableness of a traffic stop is an objective inquiry)).  "[I]f an officer reasonably believes that a windshield crack renders a vehicle unsafe under section 316.610 of the Florida Statutes, the officer may constitutionally initiate a stop, and the propriety of that stop does not depend on whether the crack actually rendered the vehicle unsafe." *Id.* at 296 n.7.

In *Hilton*, the Florida Supreme Court held that a traffic stop violated the Fourth Amendment where the evidence focused almost exclusively on the existence of a crack in the vehicle's windshield, but the only testimony regarding the safety aspect of the windshield was an officer's testimony that there was no glass falling

out of the crack, and he was not sure whether the crack would obstruct the driver's view.  961 So. 2d at 297.  The court concluded there was insufficient evidence to provide a particularized and objective basis to suspect that the crack in the windshield rendered the vehicle unsafe in violation of Fla. Stat. § 316.10.  *Id.*

Here, the state court record supports the state court's credibility findings and its factual finding that Attorney Reosti's decision not to file a motion to suppress was strategic.  Officer Richter testified he stopped Day's vehicle on the day of the arrest (Ex. C1 at 669).  Richter testified he stopped the vehicle because he observed that the windshield was cracked "on the driver's side within the view of the driver" (*id.*).  Richter testified that if a person was looking out the windshield through the driver's side, the person's view would be obscured by the crack in the windshield (*id.* at 670).  Officer Richter testified:

> Q [by the State].  Regarding the obstruction on the windshield, did you believe it was enough to block the driver's view?
>
> A.  Yes. It was my opinion that because of the significance of the crack, if it had continued to be operated in its current condition, it could have . . . potentially caused a hazard for whoever was driving.
>
> Q.  Did you believe that could have caused him to potentially hit someone because he couldn't see clearly?
>
> A.  Sure.

> Q. Did you reasonably believe that it . . . created a condition that would create an issue that could endanger any person or property?
>
> A. Yes.

(Ex. C1 at 671–72).

Attorney Reosti testified he considered filing a motion to suppress, and in doing so he reviewed relevant case law, discovery provided by the State, and video recordings of the traffic stop (Ex. C1 at 627, 635–36, 646). Reosti testified he considered Day's description of the condition of the windshield, and he deposed the officers involved in the stop (*id.*). Attorney Reosti described what he observed from the video:

> I was given . . . at least two trooper or patrol car videos; front, downward looking, and rear looking. In one of the . . . six videos the crack in the windshield was . . . clearly visible.
> . . . .
> The camera was looking at the rear of the vehicle. Mr. Day had a . . . dark tinted rear . . . window. On that window there was a . . . door that opens and shuts, as you can see on a lot of . . . pickup trucks, so you could open it up and . . . there'd be air coming in from the back. That . . . door was completely opened, giving a fairly good view of the entire windshield. The angle of the . . . trooper's car was such that it was looking right over the top of the steering wheel, which you could see in the video. So you could see through . . . the back window. Through that . . . opening you could see the steering wheel. And above the steering wheel you could see a crack that the sun—the sun was . . . in front of the car. The sun was shining through so the crack was . . . made even more pronounced by the sun light reflecting off of the crack.
> . . . .

> The . . . crack went across . . . from the driver's side to the . . . passenger's side.  So it wasn't only above the driver's side, but it was definitely obscuring the driver's visibility, just like the trooper had mentioned.
>
> . . . .
>
> If that . . . wasn't the case, . . . that would have entered significantly into my . . . deliberation as to whether or not the motion to suppress was valid or not.
>
> . . . .
>
> The fact that I saw the crack as I described . . . lowered the percentage of success . . . that I considered with the motion to suppress down to well below 50 percent.

(Ex. C1 at 634–35).  The video from Officer Richter's patrol car camera was admitted into evidence and published during the evidentiary hearing (*id.* at 672–73).

Day's son, Cody Slay, testified at the evidentiary hearing.  Slay testified the cracks in the windshield did not obscure the driver's view (Ex. C1 at 665).  Slay admitted that officers from the Sheriff's Office had stopped him "a couple of times" to investigate the condition of the windshield but the officers determined it was "non-faulty" (*id.* at 666–67).  Slay testified he intended to replace the windshield but did not have an opportunity to do so (before the vehicle was towed following Day's arrest) (*id.* at 665–66).

Officer Richter's testimony provided a particularized and objective basis to suspect that the crack in the windshield rendered the vehicle unsafe in violation of Fla. Stat. § 316.10.  Therefore, the state court reasonably concluded that Attorney

Reosti's assessment of the suppression issue was reasonable, and that Day did not

demonstrate a reasonable probability the outcome of trial would have been different

if Reosti had filed a motion to suppress. Day is not entitled to federal habeas relief

on Ground Four.

> D.    Ground One: . "The district court's per curiam affirmance of Issue One
> on direct appeal resulted in a decision that was contrary to or based on an
> unreasonable application of clearly established federal law and/or was based
> on an unreasonable determination of the facts in light of the facts presented in
> the state court proceeding."

Day alleges the sole defense he presented at trial was that he had a prescription

for the hydrocodone pills he possessed; and the jury was presented with conflicting

evidence regarding this defense (ECF No. 1 at 6–17). Day contends under these

circumstances, it is fundamental error under Florida law for the trial court to fail to

instruct the jury on a prescription defense regardless of whether the defense

requested the instruction (*id.*). Day further contends the trial court's failure to give

the instruction violated his federal Constitutional right to "a meaningful opportunity

to present a complete defense " (*id.* at 16–17) (quoting *Crane v. Kentucky*, 476 U.S.

683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) and *California v. Trombetta*, 467

U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). Day states he presented

this claim to the First DCA on direct appeal, but the court rejected it (*id.* at 17–18).

He asserts the Florida Supreme Court denied his petition for review of the First DCA's decision (*id.* at 18).

The State contends Day did not fairly present a federal constitutional question to the First DCA; rather, he presented only a state law claim (ECF No. 17 at 8–10, 22). The State further contends Day is now procedurally barred from returning to state court to attempt to assert a federal claim; therefore, Ground One is procedurally barred from federal review (*id.*). The State contends notwithstanding the procedural default, the First DCA's adjudication of Day's "similar" state law claim is entitled to deference (*id.* at 22–24).

In reply, Day contends his argument to the First DCA, that the trial court's failure to instruct the jury on the prescription defense deprived him of a fair trial, was sufficient to present a federal claim (*see* ECF No. 21 at 3–4, 12–17).

Section 2254 requires a federal habeas petitioner to provide the state courts with a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982) (citing *Picard*, 404 U.S. at 276–77). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Id.* (citations omitted). In addition,

the habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim. *Id.* (citations omitted).

In *Baldwin v. Reese*, the Supreme Court stated that citing the federal source of law in conjunction with the state law claim, or citing a case deciding such a claim on federal grounds, or simply labeling the claim federal is sufficient to fairly present a claim. 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004). In *McNair v. Campbell*, the Eleventh Circuit applied this standard by looking at the underlying purpose of exhaustion—to "afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." 416 F.3d 1291, 1302 (11th Cir. 2005) (citation and quotation marks omitted). Given this purpose, the Eleventh Circuit held that the *Baldwin* language discussing adequate means to identify federal issues to the lower state courts was *dicta* and that a federal issue requires more than a "sprinkling of federal citations," and more than "some makeshift needles in the haystack of the state court record." *Id.* at 1303.

In this case, Day argued on direct appeal that the trial court's failure to instruct the jury on a prescription defense was fundamental error (Ex. B7). Day offered no support for this conclusion other than citations to Florida statutes and one Florida case which define the trafficking offense and recognize a prescription defense; and he cited three First DCA cases for the proposition that "the failure to instruct the jury

on the affirmative defense of the prescription exception reasonably supported by the evidence and disputed at trial constitutes fundamental error if that is the defendant's sole defense, as it was in this case" (*id.* at 23–26). Day did not cite a federal source of law in conjunction with the state law claim, nor did he cite a case deciding such a jury instruction claim on federal grounds. Day did not even label the claim "federal." Not surprisingly, the First DCA interpreted Day's claim as predicated on the state law principles he argued. *See Day*, 119 So. 3d at 488–91 (citations omitted).

Day did not put the First DCA on notice of a federal due process claim with respect to the trial court's failure to give a prescription instruction; therefore, the federal issue presented in Ground One of Day's § 2254 petition was not properly exhausted. *See, e.g., Ramos v. Sec'y, Fla. Dept. of Corr.*, 441 F. App'x 689, 697 (11th Cir. 2011) (unpublished but recognized as persuasive authority) (petitioner failed to properly exhaust federal claim that trial court erred in deny his request for jury instruction, where petitioner made no reference to federal law in his state appellate brief other than concluding his argument by stating that the failure to give the instruction denied his "Florida and federal constitutional rights to due process and a fair trial.").

A second direct appeal is not available to Day, and Fla. R. Crim. P. 3.850(c) does not authorize relief for a claim that could have or should have been raised at

trial or on direct appeal.  *See* Fla. R. Crim. P. 3.850(c); Fla. R. App. P. 9.140(b)(3) (providing that a defendant has 30 days in which to appeal a final judgment). Therefore, the claim is procedurally barred from federal review.

Day has not demonstrated he is entitled to federal review of Ground One through the "cause and prejudice" or "actual innocence" exceptions.  Day has not alleged that any external impediment prevented him from presenting a federal due process claim to the First DCA on direct appeal, so he has not shown cause for the procedural default.  And he has not proffered any new evidence which supports a colorable showing of his actual innocence of the drug trafficking charge.  Day is not entitled to federal habeas relief on Ground One.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 26th day of September 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.